# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

RICARDO R. THOMPSON, )
 )
        Plaintiff, )
 )
vs. ) Civil No. 16-cv-1095-JPG-CJP
 )
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
 )
        Defendant.[1] )

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Ricardo R. Thompson seeks judicial review of the final agency decision denying his claim for Disability Insurance Benefits (DIB) and Supplemental Security Insurance (SSI) benefits pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff alleged a disability beginning on December 8, 2012, and applied for benefits later that month. After holding an evidentiary hearing, ALJ Christopher Hunt denied the application in a written decision dated March 18, 2015. (Tr. 11–23). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 2). Plaintiff has exhausted his administrative remedies and has filed a timely complaint.

### Issues Raised by Plaintiff

Plaintiff makes the following arguments:

(1)     The ALJ erred in failing to find that plaintiff's impaired vision was a severe

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. See, *Casey v. Berryhill*, __ F3d. __, 2017 WL 398309 (7th Cir. Jan. 30, 2017). She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g).

impairment at step two and in failing to include limitations arising from impaired vision in his residual functional capacity assessment.

(2) The ALJ failed to properly weigh the opinion of state agency consultant Richard Bilinsky, M.D., and a statement from plaintiff's former employer.

**<u>Applicable Legal Standards</u>**

To qualify for Disability Insurance Benefits or Supplemental Security Income, a claimant must be disabled within the meaning of the relevant statutes and regulations.[2] "Disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568–69 (7th Cir. 2011).

Rephrased, the Court must ask the five following questions: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512–513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer to steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that there are no mistakes of law. This scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

**The Decision of the ALJ**

ALJ Hunt followed the five-step analytical framework described above. He determined that plaintiff had not worked at a level of substantial gainful activity since the alleged onset date; that he was insured for DIB only through December 31, 2016;[3] and that plaintiff had severe impairments of status post-cerebrovascular accident (stroke), diabetes mellitus, and obesity, which did not meet or equal a listed impairment.

The ALJ also found that Mr. Thompson had the residual functional capacity (RFC) to perform work at the light exertional level with some physical limitations, though none of these limitations arose out of impaired vision. Following the testimony of a vocational expert, the ALJ found that (1) plaintiff could not perform his past relevant work, but (2) that the plaintiff was not disabled because he was able to do other jobs which exist in significant numbers in the local and national economies.

---

[3] The date last insured is relevant only to the claim for DIB.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period. As both of plaintiff's points relate to his vision problems, the Court will focus on that evidence.

**1.     Agency Forms**

Mr. Thompson was 50 years old at the alleged date of disability onset. (Tr. 235.) An agency employee who interviewed him for the initial Disability Report observed that he only wore glasses to read. (Tr. 236.) Plaintiff had worked in the past as a cook, a hotel housekeeper, a security officer, and as a tech in a nursing home. (Tr. 262.)

Plaintiff stated that he could not work because of a stroke, type 2 diabetes, and hypertension. (Tr. 239). In a Function Report submitted in January 2013, he said that his eyesight limited his ability to work. He said that he could no longer read the paper or the Bible or write. He also claimed (1) to have difficulty shaving because of his eyesight and unsteadiness; (2) he did not drive because his eyesight was not good to drive at night; (3) he wore glasses all the time that had been prescribed a "year or two" earlier; and (4) that his vision was blurry. (Tr. 247–257). About six months later, plaintiff's representative submitted a report stating that, among his other problems, he had vision problems due to diabetes and that his vision was blurry. (Tr. 271, 278.)

**2.     Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in March of 2015. (Tr. 31). Plaintiff testified that he was able to read things like a newspaper or magazine with "the eye

piece", but he said that he was able to see the ALJ. (Tr. 33). Plaintiff claimed he did not read or watch television because of his blurred vision. (Tr. 51).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment. The VE testified that this hypothetical person could not do plaintiff's past work, but he could do other light jobs that exist in significant numbers in the economy—such as cleaners, cafeteria attendants and cashiers. (Tr. 56–57). The ALJ then added another limitation: that the hypothetical person would "need to avoid common dangers, such as boxes on the floor, things that are moved about." He clarified that he meant "if things are moved out of place, say down waist level or below, such as files, chairs, things that you'd walk around normally observed, but you couldn't see those well enough to avoid them." The VE testified that this person could not do the cleaner or cafeteria worker jobs, but could still do the cashier job. (Tr. 59–60).

**3.    Medical Records**

Plaintiff went to the emergency room at Touchette Regional Hospital on December 9, 2012, complaining of dizziness and blurred vision that had lasted for two days. His blood sugar level was high at 201 and his visual acuity was 20/40 in both eyes with glasses. A CT scan of his head indicated a recent infarct and the doctor diagnosed the plaintiff with having had a recent stroke. Plaintiff left the hospital after being given insulin. (Tr. 321–334).

Plaintiff returned to the emergency room the next day—December 10, 2012—with continued dizziness and blurred vision. The hospital noted that plaintiff was an insulin-dependent diabetic and that he had suffered a stroke in 2007. On exam, plaintiff had weakness of the left arm and leg and mild ataxia. The nursing notes indicate that his visual acuity was 20/40 in both eyes.

Plaintiff said he had been out of his medications for months. A CT scan of his head showed chronic ischemic changes without an acute intracerebral hemorrhage. A neurologist diagnosed plaintiff with vestibular neuronitis and prescribed him meclizine.[4] The hospital discharged plaintiff on December 12, 2012. (Tr. 339–69.)

Plaintiff saw his primary care provider, Dr. Wells, later in December. He had not seen Dr. Wells since March 2011. Dr. Wells's note says that a funduscopic exam through dilated pupils was done within the last twelve months, but there is no record of that eye exam in the file. Dr. Wells diagnosed plaintiff with hypertension, hyperlipidemia, uncomplicated and uncontrolled diabetes, and erectile disorder. (Tr. 408–411.)

Plaintiff established care with Dr. Albarcha as his primary care provider in June 2013. Plaintiff had lost his job and insurance, so he was there to "have a followup and obtain some medicine samples." Dr. Albarcha encouraged him to apply for a medical card and referred him to a "patient assistance program." There are no notes regarding his vision. (Tr. 444–445.)

Vittal Chapa, M.D., performed a consultative examination in April 2013. Plaintiff told him that his second stroke in December 2012 affected his eyesight. Dr. Chapa tested plaintiff's vision. The results were "Right eye 20/200 with pinhole 20/100 and left eye 20/70 with pinhole 20/100."[5] The testing "was done with his eyeglasses." (Tr. 431–436.)

**4. Dr. Bilinsky's Opinion**

---

[4] "Vestibular neuronitis is a disorder characterized by a sudden severe attack of vertigo (a false sensation of moving or spinning) caused by inflammation of the vestibular nerve, the branch of the 8th cranial nerve that helps control balance." MERCK MANUAL, *Vestibular Neuronitis*, http://www.merckmanuals.com/home/ear-nose-and-throat-disorders/inner-ear-disorders/vestibular-neuronitis, (last visited on August 19, 2017.)

[5] Pinhole eye testing is "a test performed on a person who has diminished visual acuity to distinguish a refractive error from organic disease. A refractive error may be corrected with glasses, whereas organic disease may signal the development of preventable blindness. Several pinholes, 0.5 to 2 mm in diameter, are punched in a card. The patient selects one and looks through it with one eye at a time, without wearing corrective lenses. If visual acuity is improved, the defect is refractive; if not, it is organic. The pinhole effect results from blocking peripheral light waves, which are most distorted by refractive error." MOSBY'S MEDICAL DICTIONARY, *pinhole test*, http://medical-dictionary.thefreedictionary.com/pinhole+test, (last visited on August 19, 2017.)

Dr. Bilinsky assessed plaintiff's RFC based upon a review of the record in October 2013. He noted that plaintiff suffered from impairments of cerebral degeneration and low vision. Because Dr. Chapa's report said that plaintiff had been uncooperative in the testing of his range of motion, hand grip, and walking, Dr. Bilinsky said that it was impossible to assess plaintiff's functional limitations. Therefore, Dr. Bilinsky claimed that plaintiff had no exertional limitations—meaning that plaintiff was capable of heavy work—but Dr. Bilinsky did assign postural limitations. With regard to plaintiff's vision, Dr. Bilinsky said that plaintiff's visual acuity with pinhole correction was 20/70 in the left eye and 20/100 in the right eye. He concluded that the "far acuity" was limited in both eyes. (Tr. 81–85). Dr. Bilinsky interpreted Dr. Chapa's report as saying that plaintiff's vision with pinhole correction was 20/100 in the right eye and 20/70 in the left eye. The language of Dr. Chapa's report, quoted above, seems to indicate that the vision with pinhole correction in the left eye was 20/100. Dr. Bilinsky did not explain why he interpreted Dr. Chapa's report as he did.

**<u>Analysis</u>**

Plaintiff argues that the ALJ should have found that his visual impairment was a severe impairment at step two and should have accounted for it in his RFC assessment.

First, the step-two argument is incorrect. At step two of the sequential analysis, the ALJ must determine whether the claimant has one or more severe impairments. This is only a "threshold issue," and—as long as the ALJ finds at least one severe impairment—he must continue on with the analysis. And, at step four, he must consider the combined effect of all impairments, severe and non-severe. Therefore, a failure to designate a particular impairment as "severe" at step two is not dispositive to the outcome of the case so long as the ALJ finds that the claimant has

at least one severe impairment. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012), citing *Castile v. Astrue*, 617 F.3d 923, 927–928 (7th Cir. 2010).

Plaintiff is correct, however, that the ALJ failed to consider the effects of his visual impairment. The ALJ said that plaintiff "did not allege disability due to vision problems." (Tr. 15). On the contrary, it is clear both from plaintiff's Function Reports and from his testimony that he claimed functional limitations arising from his vision.

The ALJ noted the results of the vision testing done at Touchette Regional Hospital and by Dr. Chapa, but then said that plaintiff had a driver's license and "had no difficulty seeing the undersigned." From this, he apparently concluded that plaintiff had no limitations arising from his vision problems.

The ALJ failed to consider the rather precipitous change in plaintiff's vision. His vision was 20/40 in both eyes in December 2012. Only four months later, Dr. Chapa's testing, done with eyeglasses, showed "Right eye 20/200 with pinhole 20/100 and left eye 20/70 with pinhole 20/100." (Tr. 431–436). In addition, Dr. Chapa's testing showed impaired vision with pinhole correction, but the ALJ failed to explain whether he considered that significant. The Court is not suggesting here that the ALJ should have interpreted the significance of the change in plaintiff's vision or the results of pinhole testing himself. Rather, he should have obtained medical evidence from Dr. Bilinsky or another medical expert to guide him.

The Court also agrees that the ALJ gave no clear explanation of how he weighed Dr. Bilinsky's opinion. The ALJ said he gave it "considerable weight," but that is obviously not correct. Dr. Bilinsky opined that plaintiff was capable of heavy work, but the ALJ found that he was limited to light work. In any event, the ALJ failed to acknowledge that Dr. Bilinsky found

that plaintiff had a visual impairment.

The Commissioner argues that any error was harmless because "even when the ALJ included in the hypothetical question vision problems that would make it difficult to see and avoid objects while working, the vocational expert testified that the 1.5 million cashier positions she identified would remain appropriate." (Doc. 26, p. 6.) This argument assumes that the limitation posited by the ALJ ("if things are moved out of place, say down waist level or below, such as files, chairs, things that you'd walk around normally observed, but you couldn't see those well enough to avoid them") would adequately accommodate plaintiff's vision problems. There is simply no way to know that based on the lack of medical evidence on that point.

Because of the ALJ's errors in determining plaintiff's RFC, this case must be remanded. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). See also, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("[A] a denial of benefits cannot be sustained where an ALJ failed to articulate the bases of his assessment of a claimant's impairment.")

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

Conclusion

The Commissioner's final decision denying Ricardo R. Thompson's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing

and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE: September 7, 2017**

              **s/ *J. Phil Gilbert***
              **J. PHIL GILBERT**
              **UNITED STATES DISTRICT JUDGE**